# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JENS-PETER ENGELUND, *et al.*,

Petitioners,

v.

WARDEN CLAIR DOLL, *et al.*,

Respondents.

No. 4:20-CV-00604

(Judge Brann)

## MEMORANDUM OPINION

### APRIL 24, 2020

## I.    BACKGROUND

Jens-Peter Engelund, Pancong Gong, Rolando Galeano-Xitumul, German Santos, William Marroquin Cordova, Luis Ramos Cruz, Julio Sanchez Moronta, Bryan Miguel Ramirez-Diaz, Antonio Lopez Ramirez, Ricardo Mendez Gabriel, Wilder Cordon Salguero, Hever David Gomez, Rigoberto Cruz-Gallegos, Gustavo Alvarado Ruiz, and Jorge Lemus Rosa (collectively "Petitioners") have filed this 28 U.S.C. § 2241 petition alleging that their continued civil detention violates their substantive and procedural due process rights under the Fifth Amendment to the United States Constitution.[1]

Petitioners are individuals from around the world who are being held in civil detention by the United States Department of Homeland Security, Immigration and

---

[1]   Doc. 1.

Customs Enforcement ("ICE") at York County Prison ("York County") and Pike County Correctional Facility ("Pike County"), pending final disposition of their immigration cases. Petitioners all suffer from varying chronic medical conditions that they allege place them at an increased risk of death or serious injury if exposed to Coronavirus Infectious Disease 2019 ("COVID-19").

Petitioners have filed a motion for a temporary restraining order ("TRO"), seeking their immediate release from custody until such a time as they are no longer at risk of serious injury or death from COVID-19.[2]  Respondents are Clair Doll, Warden of York County, and Craig Lowe, Warden of Pike County.[3]  Under an expedited and condensed timeline, the parties have submitted well-researched briefs of exceeding quality, and participated in a telephonic oral argument before the Court.[4]  As such, the matter is ripe for disposition and, for the reasons discussed below, the motion will be denied.

---

[2]    Doc. 2.  Gao and Salguero have been released from ICE custody, and therefore no longer seek § 2241 relief.  (Doc. 23 at 4).  Moreover, to the extent that Cruz-Gallegos has tested positive for COVID-19, (Doc. 23 at 15), the Court is no longer "able to grant the requested relief"— release from custody to avoid exposure to COVID-19—and his claim would therefore be moot. *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017).

[3]    Doc. 1 at 9.  Although Simona Flores-Lund, Matthew T. Albence, Chad Wolf, and ICE have been named as Respondents, only the person who has custody over Petitioners is a proper Respondent.  *See* 28 U.S.C. § 2243; *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004).  As such, all Respondents other than Doll and Lowe will be dismissed from this action.

[4]    The Court pauses briefly to extend its gratitude to the attorneys for their professionalism, courteous demeanor, and excellent work under conditions and timelines that, for many attorneys, would result in subpar work.  Their efforts are commendable, and, in the Court's view, the attorneys of record have, in this matter, represented the best of our profession.

### A.     COVID-19

In recent months, COVID-19 has swept across the world and been declared a global health pandemic by the World Health Organization.[5]  Because COVID-19 is caused by a novel form of the coronavirus, humans have no immunity to the virus and, currently, there is no cure, vaccine, or known anti-viral treatment for COVID-19.[6]  The virus is highly contagious, and is spread through "respiratory particles of moisture and mucous" that are transmitted through the air or which fall on surfaces that are later touched by an individual.[7]  The primary method used to combat the spread of COVID-19, socially distancing, seeks to maintain enough distance between individuals to break the chain of transmission—generally at least six feet.[8]

Most individuals infected with COVID-19 develop only mild or moderate respiratory symptoms and recover with no medical intervention, but in a minority of cases individuals experience serious illness or death.[9]  Some populations—most notably the elderly and those with certain preexisting medical conditions—are more

---

[5]   Doc. 1 at 11.

[6]   Doc. 1-3 at 4, 6-7.

[7]   *Id.* at 4-6.

[8]   *Id.* at 7.

[9]   *Q&A on Coronavirus (COVID-19): What Are the Symptoms of Coronavirus*, World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last accessed Apr. 23, 2020).

susceptible to developing serious illness than others.[10]   Underlying medical

conditions that increase an individual's susceptibility to COVID-19 include: chronic

lung disease, moderate to severe asthma, serious heart conditions, compromised

immune systems, severe obesity, diabetes, or liver disease.[11]  Of those infected with

COVID-19, approximately 80% develop mild or moderate symptoms and 20%

require hospitalization—with approximately 2-3% of afflicted individuals dying

from the virus.[12]

The spread of COVID-19 has thus far been rapid and inexorable.  As of April

23, 2020, there are 2,658,387 reported cases globally, with 185,434 reported deaths,

while the number of confirmed cases in the United States stands at 843,937.[13]  By

April 21, 2020, there were more than 44,000 deaths in the United States.[14]  As of

April 23, 2020, in Pennsylvania there are 37,053 confirmed cases of COVID-19,

with 1,394 COVID-19 related fatalities.[15]  "There is little doubt that these figures

---

[10]  *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed Apr. 23, 2020).

[11]  *Id.*

[12]  Doc. 1-3 at 5.

[13]  Johns Hopkins University, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last accessed Apr. 23, 2020)

[14]  *Coronavirus Disease 2019 (COVID-19): Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed Apr. 23, 2020).

[15]  *COVID-1 Data for Pennsylvania*, Pennsylvania Department of Health, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed Apr. 23, 2020).

represent a significant undercount," as there has been a shortage of testing capability, and many infected individuals are asymptomatic and are therefore not tested for COVID-19.[16]

As of April 23, 2020, nationwide 287 ICE detainees have tested positive for COVID-19, but none have died.[17]  In York County, one ICE detainee tested positive for COVID-19 on April 3, 2020;[18] there have been no other reported cases in that facility since that date.[19]  In Pike County, by April 23, 2020, thirteen detainees have tested positive for COVID-19;[20] at least two non-ICE prisoners confined at Pike County have died from COVID-19, and seven prison guards have tested positive.[21]

## B.    Petitioners' Histories

Engelund has been a lawful permanent resident of the United States for ten years and has four U.S. citizen children, but was detained by ICE and placed in deportation proceedings as a result of two criminal convictions—one related to a firearms charge, and one related to violating a protective order.[22]  He is now detained

---

[16]  Doc. 1-3 at 4; *see id.* at 4-5.

[17]  Immigration and Customs Enforcement, ICE Guidance on COVID-19: Confirmed Cases, https://www.ice.gov/coronavirus (last accessed Apr. 23, 2020).

[18]  Doc. 17-1 at 21.

[19]  Immigration and Customs Enforcement, ICE Guidance on COVID-19: Confirmed Cases, https://www.ice.gov/coronavirus (last accessed Apr. 23, 2020).

[20]  *Id.*

[21]  Doc. 3 at 6, 7.

[22]  Doc. 1 at 19; Doc. 1-1 at 6.   Engelund's criminal history includes "convictions for battery/bodily harm, neglect of a dependent, and indirect criminal contempt for violating a

at Pike County.[23]  Engelund is fifty-two years of age, is overweight, suffers from diabetes and high blood pressure, and uses a continuous positive airway pressure machine at night.[24]  His medical conditions put him at "increased risk" of complications and death from COVID-19.[25]

Galeano-Xitumul is thirty-five years old and has been detained at Pike County since 2020, following his arrest related to a car accident that resulted in charges for driving under the influence ("DUI"), aggravated assault by DUI, reckless endangerment of another person, and simple assault.[26]  Galeano-Xitumul's throat was slit during a December 2018 attack, which left him with a permanent scar that sometimes becomes inflamed, causing difficulty breathing.[27]  His medical conditions and his age put him at "high risk" of complications and death from COVID-19.[28]

Santos is 45 years old and was detained by ICE in 2017 following state charges for possession with intent to deliver marijuana and DUI; he has been detained for 28 months at Pike County.[29]  Santos has a body mass index of 40 and

---

Protection from Abuse Order. He was most recently convicted on March 16, 2018 for illegal possession of a firearm and other weapons-related offenses."  (Doc. 17 at 27).

[23]  Doc. 1-1 at 3.

[24]  Doc. 1 at 19.

[25]  Doc. 1-3 at 9.

[26]  *Id.*; Doc. 1-1 at 15-16.

[27]  Doc. 1 at 21.

[28]  Doc. 1-3 at 10.

[29]  Doc 1 at 21; Doc. 1-1 at 19.

suffers from high blood pressure and epilepsy, all of which "place[s] him at higher risk of severe illness or death if he contracts COVID-19."[30]  Cordova is detained at York County following his second illegal entry into the country[31] and has a history of breathing problems that are suggestive of undiagnosed asthma.[32]  This condition puts him at an "increased risk" of severe illness or death if he contracts COVID-19.[33]

Cruz is 29 years old and is confined at Pike County pending removal following his third illegal entry into the country.[34]  Cruz "has a long history of smoking, which places him at higher risk of lung disease if he contracts COVID-19."[35]  Moronta is being held at Pike County after being placed in deportation proceedings following three convictions for possession with the intent to distribute heroin.[36]  He suffers from asthma and regularly used an inhaler when he was a child.[37]  His asthma puts him at high risk of serious harm or death if he contracts COVID-19.[38]

---

[30]  *Id.*

[31]  Doc. 17 at 29-30.

[32]  Doc. 1 at 22.

[33]  Doc. 1-3 at 10.

[34]  Doc. 1 at 22; Doc. 17 at 30.

[35]  Doc. 1 at 22.

[36]  *Id.* at 23; Doc. 1-1 at 27.

[37]  Doc. 1 at 23; Doc. 17 at 31.

[38]  Doc. 1 at 23.

Ramirez-Diaz is 29 years of age and is confined at Pike County following numerous arrests, including two for DUI.[39]  Ramirez Diaz suffers from Bell's Palsy, which causes one half of his face to become paralyzed for approximately one week at a time.[40]  Outbreaks cause sight issues, pain and discomfort in the facial region, uncontrollable drooling and difficulty eating and drinking.[41]  This condition could make it "harder for him to clear secretions in the event of a lung infection" caused by COVID-19.[42]  Ramirez-Diaz has also been experiencing COVID-19 symptoms, including a dry cough and fever, and shares a cell with two other individuals who have been experiencing flulike symptoms.[43]

Lopez-Ramirez has been detained at York County since March 6, 2020, when he was detained following multiple charges, including for DUI and First Degree Vehicle Assault.[44]  Lopez-Ramirez has suffered from two strokes which caused ongoing paralysis in his left arm.[45]  Lopez-Ramirez also suffers from headaches,

---

[39]  *Id.* at 24; Doc. 1-1 at 31; Doc. 17 at 31-32.

[40]  Doc. 1 at 24.

[41]  *Id.*

[42]  Doc. 1-3 at 10-11.

[43]  Doc. 1 at 25.

[44]  *Id.*; Doc. 17 at 32-33.

[45]  Doc. 1 at 25.

body aches, and leg pain as a result of a prior automobile accident.[46]  This puts him "at risk for" severe illness or death if he contracts COVID-19.[47]

Gabriel has been confined at Pike County since December 2019, when he was detained for DUI and assault charges.[48]  Gabriel suffers from gastritis and is a chronic smoker who smokes approximately one pack of cigarettes per day.[49]  Gabriel experiences near-daily headaches resulting from an earlier automobile accident.[50] Gabriel's medical conditions place him at an increased risk of severe injury or death if he contracts COVID-19.[51]

Gomez is being detained at the Pike County pending deportation proceedings following his illegal entry into the United States.[52]  Gomez previously had dangerous blood sugar levels which necessitated a strict diet to control those levels; "Gomez feels that he can no longer control his diet to the degree necessary to avoid consuming harmful sugars."[53]  This allegedly places Gomez at an elevated risk of harm or death if he contracts COVID-19.[54]  Cruz-Gallegos was arrested for DUI and

---

[46]  *Id.* at 25-26.

[47]  Doc. 1-3 at 11.

[48]  Doc. 1 at 26; Doc. 17 at 33-34.

[49]  Doc. 1 at 26.

[50]  *Id.*

[51]  *Id.*

[52]  *Id.*; Doc. 1-1 at 46.

[53]  Doc. 1 at 27.

[54]  *Id.*

is detained at Pike County pending the completion of his removal proceedings for illegal entry into the United States.[55]   He suffers from asthma and routinely experiences shortness of breath, and likely suffers from diabetes.  These conditions place him at high risk of serious illness or death from COVID-19.[56]  In the days since this petition was filed, Cruz-Gallegos has tested positive for COVID-19.[57]

Ruiz is confined York County pending his removal for overstaying his visa; Ruiz has several previous non-violent criminal convictions.[58]  Ruiz suffers from diabetes and high cholesterol, which places him at a higher risk of harm or death if he contracts COVID-19.[59]  Finally, Rosa is detained at Pike County following two DUI arrests.[60]  Rosa is a chronic smoker, and has been diagnosed with asthma, chronic sinus infections, and diabetes.[61]  These conditions place Rosa at a higher risk of serious illness or death if he contracts COVID-19.[62]

---

[55]   *Id.* at 28; Doc. 1-1 at 50.

[56]   Doc. 1 at 28.

[57]   Doc. 23 at 15.

[58]   Doc. 1 at 29; Doc. 1-1 at 58; Doc. 17 at 36.

[59]   Doc. 1 at 29.

[60]   *Id.* at 30.

[61]   *Id.*

[62]   *Id.*

## C.    Conditions of Confinement

Although the measures that York County and Pike County have put in place to combat COVID-19 are largely similar, Petitioners' conditions of confinement vary depending upon in which facility they are confined.

### 1.    York County

At York County, detainees are confined in dormitory-style rooms that, in ordinary circumstances, contain fifty detainees, with beds spaced approximately two feet apart.[63]   York County has the capacity to house 2,245 individuals and "has historically often operated near capacity."[64]   As of the morning of April 17, 2020, York County housed 1,238 individuals.[65]

Since the start of the current pandemic, York County has taken several measures to mitigate the threat of COVID-19 within the facility.   During intake medical screenings, detainees are assessed for fever and respiratory illness and are asked whether, in the past fourteen days, they have had close contact with a person infected with COVID-19 or have traveled through areas with sustained community transmission.[66]

---

[63]   Doc. 1 at 13.

[64]   Doc. 17-1 at 4.

[65]   *Id.*

[66]   *Id.* at 5.

Detainees with symptoms of COVID-19 are placed in isolation and tested for the virus. If any individuals test positive, they remain isolated and are treated; if necessary, they are transferred to a local hospital for further treatment.[67] Asymptomatic individuals are placed in "cohorts"[68] with restricted movement for a period of fourteen days following their last exposure to COVID-19, which is thought to be the outer end of the virus' incubation period.[69] The detainees are monitored daily for fever and symptoms of respiratory illness.[70]

York County also provides inmates with soap, water, and "hard surface disinfectant."[71] Each detainee is issued a bar of soap for use, which is "immediately" replaced upon exhaustion.[72] Alcohol-based hand sanitizer is available for staff but, for security purposes, is not provided to detainees.[73] "High traffic and contact areas

---

[67] *Id.*

[68] According to the Government, "[c]ohorting is an infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases." (Doc. 17-1 at 5).

[69] *Id.*

[70] *Id.*

[71] *Id.* at 6.

[72] *Id.*

[73] *Id.* The Centers for Disease Control and Prevention ("CDC") recommends the use of alcohol-based hand sanitizer only "[i]f soap and water are not readily available." How to Protect Yourself and Others, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed Apr. 21, 2020).

are cleaned repeatedly throughout the day.   The facility administration is encouraging both staff and the general population to use these tools often and liberally."[74]   Medical staff also "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[75]

According to the Government, protective masks have been provided to detainees to help prevent the spread of COVID-19:

> All detainees and inmates were issued surgical masks to wear on or about April 7, 2020.  Detainees and inmates must wear their issued mask anytime they are out of their cell.  In all "dormitory" housing areas, detainees and inmates must wear masks when not sleeping.  If they can wear the mask while sleeping it is preferred, but not mandatory.  The detainee or inmate may remove the mask to eat, take drinks, and to shower.  All inmates and detainees must wear their mask during recreation.  The masks will be laundered once a week.  Once the prison obtains more masks every detainee or inmate will receive two masks.  One mask will be placed in their laundry bag and sent out in accordance with the housing unit's normal laundry schedule.  All detainees and inmates are not permitted to wash their own masks.  Detainees and inmates must follow all directions concerning the donning and doffing of masks.  These directions were provided to each inmate when they received their mask on April 8, 2020.  Detainees on isolation status are required to wear a N-95 mask when they leave a cohorted housing unit.  Additionally, any detainees being transported to a hospital or outside medical appointment or as directed by . . . medical staff, are required to wear a surgical mask.  Detainees and inmates were instructed to wash their hands thoroughly before touching the mask.[76]

---

[74]   Doc. 17-1 at 6.

[75]   *Id.* at 22.

[76]   *Id.* at 21-22.

Detainees who refuse to wear a mask are removed from their housing unit and placed in an isolated cell.[77]

York County has also begun taking steps to protect the prison from outside exposure. York County now screens all staff and vendors when they enter the facility, including the use of body temperature checks,[78] and requires that all staff or personnel entering the facility wear an N-95 mask.[79] York County limits contact between detainees and their attorneys by permitting only telephonic contact or non-contact legal visits in the facility's visitation room.[80]

Despite these precautions, detainees remain housed in large rooms with numerous other detainees.[81] They alleged that they sleep and eat in close proximity and are unable to effectively distance themselves from each other.[82] While the detainees are provided with masks, they must wear the same masks "all day, every day."[83] In at least one instance, a detainee was allegedly left in a dorm room for five days after she began exhibiting COVID-19 symptoms, and later tested positive for COVID-19, although none of the other detainees have been tested for COVID-19.[84]

---

[77]   *Id.* at 22.

[78]   *Id.* at 6.

[79]   *Id.* at 21.

[80]   *Id.* at 7.

[81]   Doc. 1 at 20.

[82]   *Id.*

[83]   *Id.*

[84]   *Id.*

### 2.     Pike County

Pike County is laid out in a more traditional fashion: typically three detainees are housed in each cell, with each cell separated from the rest of the prison by doors made from metal bars.[85]  Pike County "has the capacity to house 375 detainees and has historically often operated near capacity."[86]  As of the morning of April 17, 2020, Pike County housed 152 detainees.[87]

As with York County, at Pike County detainees are subject to intake medical screenings where they are assessed for fever and respiratory illness and are asked whether, in the past fourteen days, they have had close contact with anyone who is infected with COVID-19 or have traveled through areas with sustained community transmission.[88]

Detainees with symptoms of COVID-19 are placed in isolation and tested for the virus.  If individuals test positive, they remain isolated and are treated; if necessary, they are transferred to a local hospital for treatment.[89]  Asymptomatic individuals are placed in cohorts with restricted movement for a period of fourteen

---

[85]   *Id.* at 13.

[86]   Doc. 17-1 at 4.

[87]   *Id.*

[88]   *Id.* at 5.

[89]   *Id.*

days following their last exposure to COVID-19.[90]   The detainees are monitored

daily for fever and symptoms of respiratory illness.[91]

Pike County also provides soap, water, and "hard surface disinfectant" for

every housing unit.[92]   As in York County, staff is provided alcohol-based hand

sanitizer, while detainees are not, and "[a]ll high traffic and contact areas within each

housing unit are cleaned multiple times throughout the day.  The administration is

encouraging both staff and the general population to use these tools often and

liberally."[93]  Daily temperature checks and screening for COVID-19 symptoms have

been implemented for all detainees and, if any detainee displays such symptoms,

they and their cell mates are placed in quarantine.[94]

Pike County has also "instituted a modified lockdown schedule."[95]

Movement throughout the facility is restricted; detainees leave their cells in a

staggered fashion to maintain social distancing, and all detainees are required to

practice social distancing with any individuals who are not housed within their cell.[96]

---

[90]   *Id.*

[91]   *Id.*

[92]   *Id.* at 6.

[93]   *Id.*; *see id.* at 22.

[94]   *Id.* at 22.

[95]   *Id.*

[96]   *Id.*

Meals are served to detainees in their cells, rather than at a cafeteria.[97]  Pike County

has issued masks to detainees and its staff:

> All detainees, inmates, and staff are now required to wear masks within
> the facility.  All detainees and inmates have been issued masks within
> the last week.  ICE has provided the Pike County Prison with an
> additional 500 surgical masks and 240 N[-]95 masks for use amongst
> staff and detainees . . . Detainees and inmates were issued surgical
> masks by the prison during the last week.[98]

Pike County now screens and performs temperature checks on all staff and

vendors when they enter the facility.[99]  Pike County permits detainees to speak with

their attorneys telephonically or through non-contact legal visits within the visitation

room at the facility.[100]

Despite these efforts, Respondents assert that several issues continue to plague

Pike County.  There is not enough soap for the detainees to regularly wash their

hands[101] and, although Petitioners have been issued masks, they must reuse those

masks for one week.[102]  Detainees must share several portable electronic devices

(tablets) to contact family and place medical requests, and the detainees are not able

---

[97]  *Id.*

[98]  *Id.* at 22-23.

[99]  *Id.* at 6.

[100]  *Id.* at 7.

[101]  Doc. 1 at 14, 22, 23.

[102]  *Id.* at 15, 29.

to sanitize those tablets.[103]   Finally, although guards are required to wear masks, Petitioners report that guards sometimes fail to wear the required protective gear.[104]

## II.   DISCUSSION

The dispute between the parties centers around two issues.   First, the Government asserts that the relief sought is not appropriate in a § 2241 petition, as Petitioners seek release from custody, rather than changes to the conditions of confinement.[105]   Second, the Government argues that Petitioners have not met the standard to grant a temporary restraining order because they have not demonstrated: (1) a likelihood of success on the merits, as the procedures put in place to protect ICE detainees at the facilities ensure that Petitioners' confinement remains constitutional; (2) a risk of irreparable harm; or (3) that the balance of equities tips in their favor.[106]   The Court will address these issues in turn.

### A.   Whether Relief Sought is Appropriate in a § 2241 Petition

First, Respondents contend that Petitioners may not seek release from custody through their § 2241 petition.[107]   The Court will quickly address this issue.   Although precedent from the United States Supreme Court and United States Court of Appeals for the Third Circuit on this issue is limited, the question of whether individuals may

---

[103]  *Id.* at 14, 23-24, 28.

[104]  Id. at 15.

[105]  Doc. 17 at 54-56.

[106]  *Id.* at 37-54.

[107]  *Id.* at 54-56.

seek release from custody through a § 2241 petition has been examined numerous times in the past weeks by several judges within this District—in every case, they have concluded that such relief is appropriate.[108]

I agree that precedent establishes—at a minimum—that "certain extraordinary conditions of confinement may warrant a habeas remedy," particularly where those conditions "would mark a fundamental shift in the nature of [Petitioners'] confinement."[109]  Those conditions are present here and, consequently, Petitioners may seek release from custody by way of their § 2241 petition.

### B.    Whether Injunctive Relief is Appropriate

The Government next argues that Petitioners have not met their burden to obtain a TRO.[110]  "A preliminary injunction is an extraordinary remedy, which should be granted only in limited circumstances."[111]  As the Supreme Court has emphasized, "a preliminary injunction is an extraordinary and drastic remedy, one

---

[108]  *See, e.g., Thakker v. Doll*, __ F.Supp.3d __, __, No. 1:20-CV-480, 2020 WL 1671563, at *2 (M.D. Pa. Mar. 31, 2020); *Camacho Lopez v. Lowe*, No. 3:20-CV-563, 2020 WL 1689874, at *4-6 (M.D. Pa. Apr. 7, 2020); *Verma v. Doll*, No. 4:20-CV-14, 2020 WL 1814149, at *3-4 (M.D. Pa. Apr. 9, 2020); *Saillant v. Hoover*, No. 1:20-CV-00609, 2020 WL 1891854, at *3 (M.D. Pa. Apr. 16, 2020).

[109]  *Camacho Lopez*, 2020 WL 1689874, at *5-6.  *See also Verma*, 2020 WL 1814149, at *4; *Saillant*, 2020 WL 1891854, at *3.

[110]  Doc. 17 at 37-54.

[111]  *Greater Phila. Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) (footnote and internal quotation marks omitted).

that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."[112]  To obtain a TRO, a movant must demonstrate:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) that the public interest weighs in favor of granting the injunction.[113]

"Generally, the moving party must establish the first two factors and only if these 'gateway factors' are established does the district court consider the remaining two factors."[114]  "The court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[115]

### 1.    Likelihood of Success on the Merits

Petitioners seek a TRO on two grounds.  First, they assert that their conditions of confinement amount to unconstitutional punishment of civil detainees, in violation of the Fifth Amendment to the United States Constitution.[116]  Second, Petitioners argue that their detainment amounts to cruel and unusual punishment, also in violation of the Fifth Amendment.[117]

---

[112]  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

[113]  *Greater Phila. Chamber of Commerce*, 949 F.3d at 133 (brackets and footnote omitted).

[114]  *Id.*

[115]  *Id.* (internal quotation marks omitted).

[116]  Doc. 3 at 13-15.

[117]  *Id.* at 16-17.  Because Respondents are civil detainees, their claim proceeds under the Fifth Amendment, rather than the Eighth Amendment, although the elements of a claim under the Fifth Amendment are identical to a claim under the Eighth Amendment.  *See Ziglar v. Abbasi*,

### i.    Unconstitutional Punishment

With respect to Petitioners' conditions of confinement claim, they must demonstrate that their conditions of confinement "amount to punishment of the detainee."[118] "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [this Court] may infer that the purpose of the governmental action is [unconstitutional] punishment."[119] Stated differently, the Court must consider "whether the conditions and restrictions of the Jail were rationally connected to these valid objectives and whether the conditions and restrictions were excessive in relation to these objectives."[120]

In assessing whether a governmental interest is legitimate, the Supreme Court has not "detail[ed] the precise extent of the legitimate governmental interests that

---

137 S. Ct. 1843, 1877 (2017) (noting that while plaintiff's "'deliberate indifference' claim . . . [proceeded] under the Fifth Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual Punishment Clause . . . that is because the latter applies to convicted criminals while the former applies to pretrial and immigration detainees" (Breyer, J., dissenting)); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (stating that "the due process rights of a person [under the Fifth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner"). *See also Powers-Bunce v. D.C.*, 541 F. Supp. 2d 57, 66 (D.D.C.) ("The Court looks to the two-part analysis laid out in *Farmer v. Brennan,* 511 U.S. 825 (1994), to decide whether a Fifth Amendment violation was perpetrated by the individual Defendants), *reconsidered in part on other grounds*, 576 F. Supp. 2d 67 (D.D.C. 2008).

[118] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[119] *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal quotation marks omitted).

[120] *Union Cty. Jail Inmates v. Di Buono*, 713 F.2d 984, 993 (3d Cir. 1983).

may justify conditions or restrictions of pretrial detention."[121] However, the Supreme Court has recognized that ensuring detainees' presence at hearings, along with "the effective management of the detention facility once the individual is confined" constitute legitimate governmental interests.[122] The Third Circuit has also held, in an unpublished opinion, that the Government has a "legitimate . . . interest[] in reducing the flight risk posed by prisoners facing removal."[123]

With regard to the second consideration, the Supreme Court has emphasized that,

> [i]n determining whether conditions or restrictions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.[124]

Viewed under this standard, the Court concludes that Petitioners have failed to sustain their burden of making a "clear showing" that their conditions of confinement amount to unconstitutional punishment.[125] First, it is beyond cavil that the Government has at least one, and in some cases two, legitimate governmental

---

[121] *Bell*, 441 U.S. at 540.

[122] *Id.*

[123] *Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134 (3d Cir. 2017).

[124] *Bell*, 441 U.S. at 540 n.23.

[125] *Mazurek*, 520 U.S. at 972.

interests in continued detention: to prevent Petitioners from absconding and avoiding removal, and in protecting the public.[126]

Second, Petitioners' continued confinement is reasonably related to those legitimate governmental interests, as it guarantees both that the safety of the public is maintained, and that Petitioners will attend their deportation proceedings. Although there are other methods that may help protect the public and ensure that Petitioners comply with deportation proceedings, detainment is the only method that guarantees the fulfillment of the Government's goals. Moreover, the relevant question is not whether there are other, less restrictive methods at the Government's disposal, or even whether the Government's chosen course of action is the wisest or best way to proceed. The only limitation on the Government's ability to act is that the chosen course of action be reasonably related to its legitimate goal. Here, that standard is clearly satisfied.

The current conditions at the facilities do not undermine this conclusion. The Court recognizes that "[p]risons present unique concerns regarding the spread of this

---

[126] Although not all Petitioners present a risk to the public, some certainly do. Engelund has previous convictions for unlawful possession of firearms, violating protection from abuse orders, and battery, (Doc. 17-1 at 7-8), while Mendez-Gabriel has been convicted of domestic violence and assault. (*Id.* at 13-14). Additionally, several Petitioners (Galeano-Xitumul, Santos, Ramirez-Diaz, Mendez-Gabriel, Gomez-Vasquez, Gallegos, Lemus-Rosa, Lopez-Ramirez, and Alvarado-Ruiz) have been charged with, or convicted of, DUIs. (*Id.* at 9-10, 12-17, 19-20). These offenses, although not violent in nature, present a serious risk to the public. *See United States v. Surine*, __ F.Supp.3d __, __, No. 4:07-CR-00304-1, 2019 WL 6699914, at *4 (M.D. Pa. Dec. 9, 2019) (noting that driving under the influence is a "highly dangerous offense").

virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'"[127]   Nevertheless, CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic.[128] More importantly, conditions no longer resemble the "unsanitary, tightly-packed environments" that led other judges in this District to order the release of ICE detainees.[129]   To the contrary, the record reflects that the facilities have taken proactive measures to prevent or limit the spread of COVID-19 and to ensure the health of its detainees.[130]

First, although the facilities do not permit the type of social distancing that individuals may undertake in their homes,[131] the facilities have removed many detainees and are now operating far below their historical capacities: as of April 17,

---

[127]   *Verma*, 2020 WL 1814149, at *4.

[128]   *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Apr. 22, 2020).

[129]   *Thakker*, 2020 WL 1671563, at *8.

[130]   The current conditions of confinement at York County and Pike County are gleaned from the declaration provided by Christopher George, ICE's assistant field office director, who oversees ICE immigration enforcement operations in Pennsylvania.  (Doc. 17-1).  Petitioners object to George's declaration on the ground that it is not based on "first-hand knowledge" but, rather, is based upon information obtained from records and statements by George's subordinates.  (Doc. 23 at 9-10).  However, "[i]t is well established that 'a preliminary injunction is customarily [resolved] on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits'" and, thus, in considering motions for emergency relief, district courts may rely upon "affidavits and other hearsay materials" that are not admissible at trial.  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718-19 (3d Cir. 2004) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  The Court will therefore rely upon George's declaration in deciding this motion.

[131]   *See* Doc. 1 at 13, 20.

Pike County was operating at less than forty-one percent capacity, while York County was operating at approximately fifty-five percent capacity.[132]  Thus, in Pike County, two, or sometime even one, individuals are housed in a cell—rather than three individuals as was previously the case.  In York County, there may now only be 27 or 28 individuals in a room, rather than 50 as before.

Second, both facilities are undertaking significant measures to sanitize the detainees' environment, as well as prevent the introduction or spread of COVID-19 within the facilities.  Thus, both Pike County and York County have incorporated into their intake medical screenings tests and questions designed to elicit whether an incoming detainee has potentially been exposed to COVID-19.[133]  Detainees with symptoms of COVID-19 are placed in isolation, tested, and treated; asymptomatic individuals are cohorted and restricted in their movements, and monitored daily for symptoms.[134]

Both facilities provide inmates with soap, water, and "hard surface disinfectant" that is replaced when exhausted.[135]  Alcohol-based hand sanitizer is provided to staff, and "[h]igh traffic and contact areas are cleaned repeatedly throughout the day."[136]  York County has provided all inmates with surgical masks

---

[132]  Doc. 17-1 at 4.

[133]  *Id.* at 5.

[134]  *Id.*

[135]  *Id.* at 6, 22.

[136]  *Id.* at 6.

that they are to wear at nearly all times, while staff and inmates in isolation must wear N-95 masks.[137]   At Pike County, detainees are likewise required to wear surgical masks, while staff members wear N-95 masks.[138]  Both facilities have taken steps to prevent COVID-19 from entering the facility from outside: all staff and vendors are screened when they enter the facilities, including with body temperature checks,[139] and meetings with attorneys are non-contact only.[140]

Additionally, Pike County has instituted a modified lockdown schedule with restricted movements,[141] and detainees leave their cells in a staggered fashion to maintain required social distancing.[142]   Meals are served to detainees within their cells, rather than at a cafeteria.[143]

Third, the facilities have implemented medical procedures to ensure that sick detainees are promptly tested for COVID-19 and, if necessary, quarantined and treated.   At York County medical staff "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms," while at Pike County there are daily temperature checks and screenings for COVID-19 symptoms for all

---

[137]  *Id.* at 21-22.

[138]  *Id.* at 22-23.

[139]  *Id.* at 6.

[140]  *Id.* at 7.

[141]  *Id.* at 22.

[142]  *Id.*

[143]  *Id.*

detainees; if any detainee displays such symptoms, they and their cell mates are placed in quarantine, tested, and treated.[144]

The sum of these measures ensures that Petitioners' conditions of confinement are no longer unconstitutionally overcrowded or unsanitary.[145]  The record reflects that detainees at Pike County and York County now receive adequate protection from COVID-19, and their conditions of confinement do not amount to punishment in violation of the Constitution.  To the extent that some prison guards are failing to properly comply with these policies and procedures,[146] the remedy is to ensure such compliance, not to release Petitioners from custody.[147]

## ii.    *Deliberate Indifference*[148]

Turning to Petitioners' claim for deliberate indifference, the Constitution "prohibits any punishment which violates civilized standards and concepts of

---

[144]  *Id.*; *see* Docs. 20, 21, 28 (medical records of Respondents that also demonstrate consistent temperature checks).

[145]  The Court recognizes the recent spike in COVID-19 infections at Pike County.  However, as counsel for the Government accurately noted during oral argument, the incubation period for COVID-19 is thought to be as long as fourteen days and, thus, current infections are not necessarily indicative of these preventative measures, most of which were implemented during the past fourteen days.

[146]  *See* Doc. 1 at 14-15, 22-24, 28.

[147]  *See Tillery v. Owens*, 907 F.2d 418, 429 (3d Cir. 1990) (noting that any "remedy is to be determined by the nature and scope of the constitutional violation").

[148]  It is unclear whether Petitioners pursue a deliberate indifference claim related to the conditions of confinement at the detention facilities or based on inadequate medical care; Petitioners cite the conditions of confinement standard in their brief in support of their motion, but cite the standard for inadequate medical care in their reply brief.  (*Compare* Doc. 3 at 16, *with* Doc. 23 at 19-20).  Regardless, Petitioners have not satisfied their burden under either standard.

humanity and decency."[149]  "To prevail against prison officials on a claim that an inmate's conditions of confinement violated the [Fifth] Amendment, the inmate must meet two requirements: (1) the deprivation alleged must be, objectively, 'sufficiently serious,' and (2) the 'prison official must have a sufficiently culpable state of mind.'"[150]

"The first element is satisfied when an inmate is deprived of 'the minimal civilized measure of life's necessities.'"[151]  "The second element is satisfied when an inmate shows that prison officials acted with deliberate indifference to the inmate's health or safety or conditions of confinement that violated the inmate's constitutional rights."[152]  The Third Circuit has "adopted a subjective knowledge standard to establish deliberate indifference, requiring a showing that prison officials actually knew of and disregarded constitutional violations."[153]

Similarly, with respect to claims arising from an alleged failure to provide adequate medical care, "prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit deliberate indifference to serious medical needs of prisoners."[154]  That "standard requires

---

[149]  *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (internal quotation marks omitted).

[150]  *Id.* (quoting *Farmer*, 511 U.S. at 834).

[151]  *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)).

[152]  *Id.* (quoting *Wilson*, 501 U.S. at 302-03).

[153]  *Id.*

[154]  *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (internal quotation marks omitted).

deliberate indifference on the part of prison officials and [that] the prisoner's medical needs be serious."[155]  As to the serious medical needs requirement, "[t]he detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[156]

Deliberate indifference is demonstrated where "the custodial officials 'knew or should have known' of [a] strong likelihood" of unnecessary suffering, injury, or death.[157]  Thus, "there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize [such] high risk"[158]  "Therefore, the 'should have known' element . . . connotes something more than a negligent failure to appreciate the risk . . . presented [to] a particular detainee, though something less than subjective appreciation of that risk."[159]  "[T]he risk of . . . injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."[160]

In light of the measures that Pike County and York County have taken to protect detainees housed within their respective facilities, the Court concludes that

---

[155] *Id.* (brackets, ellipsis, and internal quotation marks omitted).

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.*

Petitioners have failed to establish, under either test, that prison officials exhibited deliberate indifference.  Although COVID-19 presents a serious medical issue, as detailed above, the facilities have taken significant steps to curb the introduction or spread of COVID-19 and to contain and treat those infected with the virus.  These measures demonstrate that the facilities recognize the significant threat that COVID-19 poses to the detainees and have taken responsible steps to protect them.  Under such circumstances, it cannot be said that Respondents have been deliberately indifferent to Petitioners' health, safety, or medical needs, and they certainly have not "evidence[d] an absence of any concern for the welfare of [their] charges."[161] As one of my colleagues in this District aptly stated in a recent opinion: "There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to limit the spread throughout its facility.   [Petitioner therefore] has not established a conscious disregard for the risk posed by COVID-19."[162]

Finally, the Court briefly notes that Petitioners now assert that the lockdown measures put in place to counter and prevent the spread of COVID-19 violate Petitioners' constitutional rights, since the measures "are so restrictive as to amount

---

[161] *Id.*  Again, I note that the record demonstrates that one petitioner, Cruz-Gallegos, has been infected with COVID-19.   (Doc. 23 at 15).   However, Cruz-Gallegos has been closely monitored and appears to have received appropriate treatment following his positive test results.  (*See* Doc. 21-9; Doc. 28-4).  Given this evidence, Respondents have not demonstrated that the "facts rise to the level of deliberate indifference."  *Camacho Lopez*, 2020 WL 1689874, at *7.

[162] *Verma*, 2020 WL 1814149, at *6.

to punishment."[163]   However, this issue was raised in neither Petitioners' § 2241 petition, nor in their brief in support of their motion for a TRO.[164]

This Court generally will not consider issues raised for the first time in a reply brief because "[a] reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues."[165]  This alone is ground to refuse consideration of this argument.  More importantly, however, "a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."[166]  Given the absence of any mention of this allegedly unlawful conduct in Petitioners' § 2241 petition, their "request for injunctive relief is legally deficient" as related to the current lockdown conditions.[167]

---

[163]  Doc. 23 at 16; *see id.* at 16-18.

[164]  *See* Docs. 1, 3.

[165]  *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006).  *See also Garza v. Citigroup Inc.*, 881 F.3d 277, 285 (3d Cir. 2018) (noting that, as a general matter, issues raised for the first time in a reply brief are deemed waived).

[166]  *Martin v. Keitel*, 205 F. App'x 925, 929 (3d Cir. 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir. 1994)).

[167]  *Id.* at 928.

## 2.    Irreparable Harm[168]

Turning to the second prong of the TRO inquiry, "[t]o establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent."[169]   "'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'"[170] Conversely, "[t]he irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."[171]

Petitioners have not demonstrated an imminent—rather than speculative— possibility that they will suffer irreparable harm from COVID-19 if not released from custody.  First, the protective measures that have been put in place by Pike County and York County mitigate the risk of COVID-19 infection among most of

---

[168]  The Court recognizes that there is some dispute over whether Petitioners suffer from their self-reported medical conditions.  (*Compare* Docs. 17, 19, *with* Doc. 29).  As Petitioners' counsel notes, there may well be issues with some of the records upon which the Government relies to dispute the existence of medical conditions, (Doc. 29 at 3-5) and, out of an abundance, the Court assumes for the purposes of this motion that Petitioners do in fact suffer from their reported ailments.

[169]  *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) (internal quotation marks omitted).

[170]  *Id.* (quoting *Sampson v. Murray,* 415 U.S. 61, 90 (1974)).

[171]  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000).

the remaining Petitioners, rendering any risk of exposure too speculative to constitute irreparable harm.[172]

Second, and somewhat relatedly, Petitioners risk of harm as compared to other detainees—should they contract COVID-19—is uncertain and speculative. Although Arno Vosk, M.D., has submitted a declaration attesting that Petitioners are at an "increased risk" of complications or death from COVID-19, he does not quantify this increased risk.[173]  While such an increased risk may be present, the elevated risk could merely be *de minimus*.  As Dr. Vosk attests, approximately eighty percent of individuals infected with COVID-19 do not require hospitalization.[174]  For many Petitioners, there is no indication from the record that there is a meaningfully increased risk of complications or harm such that they may be deemed uniquely susceptible to COVID-19.

Nowhere is this better exemplified than in Dr. Vosk's statements regarding Ramirez-Diaz and Lopez-Ramirez.  With respect to Ramirez-Diaz, Dr. Vosk states only that Ramirez-Diaz's Bell's Palsy "could make it harder for him to clear secretions in the event of a lung infection."[175]  Nothing in the record demonstrates,

---

[172] There are notable exceptions, for example, Galeano-Xitumul may have been housed with a cellmate who tested positive for COVID-19.  (Doc. 23 at 15).  However, Galeano-Xitumul is not currently housed with anyone suffering from COVID-19 symptoms and, thus, would appear to no longer be at an elevated risk of exposure to the virus.  (Doc. 19 at 7-8).

[173] Doc. 1-3.  Excepted from this are Galeano-Xitumel, Santos, Moronta, Gomez, and Cruz-Gallegos, whom Dr. Vosk deems at a "high" or "elevated" risk.  (*Id.* at 10-11).

[174] *Id.* at 5.

[175] *Id.* at 10-11.

however, that Ramirez-Diaz is more likely than anyone else to develop such an infection as a result of COVID-19.  As to Lopez-Ramirez, Dr. Vosk states simply that Lopez-Ramirez is "at risk for severe illness and death from" COVID-19.[176] However, this broad statement applies to every individual in the world, as twenty percent of the population as a whole is at risk of severe illness from COVID-19.[177]

Third, Petitioners have not demonstrated that they would "be safer if [they] were released from ICE custody."[178]  Unfortunately, COVID-19 is rapidly sweeping the nation and the Commonwealth of Pennsylvania, and there is no evidence in the record that Petitioners have a location in which to shelter in place where they are less likely to contract COVID-19 than they are at these penal facilities.  Indeed, based upon the undeveloped record, it is possible that Petitioners live in highly impacted regions such as Philadelphia, and it is possible that family members with whom they would live have been infected with COVID-19, presenting a risk of infection should Petitioners return home.  Unanswered in Petitioners' petition or materials in support of their motion for a TRO is whether Petitioners are any less safe in York County or Pike County than they would be if released;[179] the inability to answer this fundamental question is ultimately fatal to their motion.

---

[176] *Id.* at 11.

[177] *Id.* at 5.

[178] *Verma*, 2020 WL 1814149, at *6.

[179] While there are several infections in Pike County, York County appears relatively safe. As noted above, only one inmate tested positive for COVID-19, with no new cases reported since

Finally, although medical care at a correctional facility is not optimal, in Pike County and York County, Petitioners have access to around-the-clock medical care and consistent checks to monitor whether they have potentially been infected with COVID-19.[180]  Moreover, should any individual test positive for COVID-19, they would be regularly monitored and have access to rapid medical care, including treatment at a local hospital, if needed.[181]  There is no evidence that Petitioners would have better access to medical care if released from custody—and therefore be safer if released—which in turn militates against a finding of irreparable harm.

Because Petitioners have not satisfied the first two factors necessary for the issuance of a TRO, the Court will not examine the remaining factors.[182]  The Court recognizes the difficult circumstances in which Petitioners find themselves, but based upon the current record, the Petitioners simply have not met their "heavy burden" of demonstrating entitlement to a TRO.[183]  In the absence of any extraordinary or compelling reasons to grant preliminary relief, the motion for a TRO will be denied.

---

this § 2241 petition was filed.  *See* Immigration and Customs Enforcement, ICE Guidance on COVID-19: Confirmed Cases, https://www.ice.gov/coronavirus (last accessed Apr. 23, 2020).

[180]  Doc. 17-1 at 5-6.

[181]  *Id.*

[182]  *See Greater Phila. Chamber of Commerce*, 949 F.3d at 133 (stating that only if movant establishes a likelihood of success on the merits and the existence of irreparable harm should "the district court consider the remaining two factors").

[183]  *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 219 n.13 (3d Cir. 2014).

## III.   CONCLUSION

For the foregoing reasons, Petitioners' motion for a TRO will be denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge